UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| O. LEE TAWES, III, | § | |
| | § | |
|      Appellant/Cross-Appellee, | § | |
| | § | |
| and | § | |
| | § | |
| MARLIN DATA RESEARCH, INC., | § | |
| | § | CIVIL ACTION NO. V-06-123 |
|      Cross-Appellee, | § | |
| | § | |
| v. | § | |
| | § | |
| DORIS BARNES, Individually and as | § | |
| Independent Executrix of the Estate of | § | |
| Leon McNair Barnes, Deceased, | § | |
| | § | |
|      Appellee/Cross-Appellant. | § | |

## MEMORANDUM & ORDER

Pending before the Court is the appeal of O. Lee Tawes, III ("Tawes") and Doris Barnes ("Barnes"), who seek to overturn a Judgment of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") in *In re: Moose Oil and Gas Company*, Case No. 02-33891-H5, Adversary Action No. 02-6012 (the "adversary proceeding").  After considering the parties' arguments, the record, and the applicable law, the Court AFFIRMS in part and REVERSES in part the decision of the Bankruptcy Court.

### Background

The facts relevant to this appeal are undisputed and were presented to the Bankruptcy Court in a Joint Stipulation.

In 1996, Moose Oil & Gas Company ("Moose O&G") acquired several oil, gas and mineral leases in Lavaca County, Texas.  Moose O&G then assigned portions of its lease interests to a group of investors (the "Moose Assignees").  O. Lee Tawes, III ("Tawes") was one of the Moose Assignees.

In 1996, American Exploration Company acquired an oil, gas and mineral lease (the "Barnes Lease") from Leon Barnes and Doris Barnes ("Barnes").  The Barnes Lease covered property adjacent to the property associated with the Moose O&G and Moose Assignee leases described above.  Ultimately, Dominion Oklahoma Texas Exploration and Production, Inc., successor in interest to Louis Dreyfus Natural Gas Corp. (collectively "Dominion"), succeeded to the lessee interest of American Exploration Company under the Barnes Lease.

In 1998, Moose O&G, the Moose Assignees, Dominion and Seisgen Exploration Inc. ("Seisgen") decided to pool their interests in the oil, gas and mineral leases discussed above.  Each of these parties agreed to be bound by the terms of a Working Interest Unit Agreement ("WIUA") and an attached Joint Operating Agreement ("JOA").  Dominion later acquired Seisgen's interest.

The WIUA provides, in part, as follows:

PROVISION II

WORKING INTEREST

The prorata working interest within the Working Interest unit shall be as set forth below:

| | |
|---|---|
| [Dominion][1] | 47.25% |
| Seisgen | 6.75% |
| Moose | <u>46.00%</u> |
| | 100.00% |

PROVISION III

LEASE BURDENS

Each party shall bear and be responsible for their own lease burdens including, but not limited to their Lessor's royalty, overriding royalty along with any and all other royalty burdens which may have been created by the party contributing the lease or leases to this Working Interest Unit.

---

[1] The Court has substituted Dominion for Louis Dreyfus.

2

PROVISION IV

OPERATIONS

[Dominion] is designated Operator of the Working Interest Unit which will be governed by the Operating Agreement attached hereto as Exhibit "B".  It is further understood between [Dominion] and Seisgen that [Dominion] and Seisgen interests are subject to those provisions provided for in that certain Joint Venture Agreement dated December 1, 1995, which are not covered in the attached Operating Agreement.

PROVISION V

MOOSE INTEREST

Moose Oil & Gas Company shall be the liable party to the Operator for the entire forty-six percent (46%) working interest within the Working Interest Unit for the parties hereinabove referred to as Moose.  Moose Oil & Gas Company shall be the responsible party, for each of said parties, to the Operator for obtaining and delivering any and all elections, notices, invoices payments and billings.

Should one or more of the Moose parties decide not to participate in a proposed operation, the participating Moose party or parties shall have the option of disbursing the non-participating Moose parties interest proportionately among the participating Moose parties.

The JOA attached to the WIUA is an American Association of Petroleum Landmen Form

610-1982 Model Form Operating Agreement.  The parties appear to have made minor

modifications to the standard terms of the agreement.  The JOA provides, in part, as follows:

ARTICLE III

INTERESTS OF THE PARTIES

. . . .

B.      Interests of Parties in Costs and Production

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of their interests which shall be borne as

3

hereinafter set forth.

Regardless of which party has contributed the leases and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of his interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

. . . .

## ARTICLE V.

## OPERATOR

A.      Designation and Responsibilities of Operator:

[Dominion] shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

. . . .

## ARTICLE VI.

## DRILLING AND DEVELOPMENT

. . . .

B.      Subsequent Operations

. . . .

2.  <u>Operations by Less than All Parties</u>: If any party receiving such notice as

provided in Article VI.B.1. or VII.D.1 (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties: provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conduction operations in the Contract Area pursuant to this Article VI.B.2., shall comply with all the terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting parties shall keep the leasehold estates and the oil and gas interests involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to the Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the

provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to the Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out or measured by the production from such well accruing with respect to such interest until it reverts shall equal the total of the following:

a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections, including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping, plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

b) 400% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C. and 400% of that portion of the cost of newly acquired equipment in the well (to and including well connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

. . . .

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

. . . .

ARTICLE VII.

EXPENDITURES AND LIABILITIES OF PARTIES

A.      Liability of Parties:

6

The liability of the parties shall be several, not joint or collective.  Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.  Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally.  It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B.      Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C".  To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.  Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

          . . . .

C.      Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development of operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C".  Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

          . . . .

Various Exhibits are attached to the JOA.  Exhibit "A" provides, in part, as follows:

3.      Percentage of working interest:

          [Dominion]                              47.25%

7

      Seisgen Exploration, Inc.        6.75%

      Moose Oil and Gas           46.00%

Exhibit "C" provides, in part, as follows:

ACCOUNTING PROCEDURE
JOINT OPERATIONS

I. GENERAL PROVISIONS

. . . .

2.      Statement and Billings

      Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month.  Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

      . . . .

II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

      . . . .

2.      Rentals and Royalties

      Lease rentals and royalties paid by Operator for the Joint Operations.

In July, 1998, Moose O&G (acting for itself and on behalf of the Moose Assignees) and Dominion formed the Baker Unit out of their pooled oil, gas and mineral leases.  The Barnes Lease, contributed by Dominion, accounted for 345.5 acres or 54% of the Baker Unit.

Several wells were drilled and operated on the Baker Unit subsequent to its creation.  The first such well, designated the David Baker No. 1 well, was consented to by all parties and operated by Dominion.  Moose O&G then proposed to drill two additional wells.  Dominion, however,

8

decided to go "non-consent" under the WIUA and JOA on these two wells.  Moose O&G then

drilled and operated these two wells, designated the Baker-Barnes No. 1 and 2 wells.  Tawes was a

consenting party to the Baker-Barnes No. 1 and 2 wells under the WIUA and JOA.  Moose O&G

later proposed a third well to be designated the Baker-Barnes No. 3 well.   Dominion consented to

this well and operated it.  The parties do not dispute that Barnes owns a 9.675% royalty as to these

four wells.

   In 2000, Barnes commenced this lawsuit in Lavaca County state district court against

Dominion and Moose O&G to recover unpaid royalties.  At the time Barnes filed suit, only the

David Baker No. 1 well and the Baker-Barnes No. 1 well were in operation.  Barnes originally

disputed the precise amount of royalties that she was entitled to on these wells and asserted causes

of action for damages to real property, breach of contact, fraud and negligent misrepresentation.

Barnes claimed that she was entitled to a 17.916% royalty while it was undisputed that she was

entitled to a 9.675% royalty.  In March 2002, Barnes demanded that the purchasers of production

on the Baker-Barnes No. 1 and 2 wells suspend payments of production proceeds to the working

interest in the wells unless or until her royalty was paid in full.

   On April 9, 2002, Moose O&G filed a voluntary petition under Chapter 7 of Title 11 of the

United States Code.  On August 12, 2002, a Notice of Removal was filed in federal court, thereby

removing Barnes' state court action.  After the filing of Moose O&G's voluntary petition, the

Baker-Barnes No. 1 and 2 wells were temporarily shut in.

    On February 13, 2002, Tawes and Marlin Data Research, Inc. ("MDR") acquired Moose

O&G's undivided working interest in the Baker Unit and the Baker-Barnes No. 1 and 2 wells at a

foreclosure sale.  Before February 13, 2002, Tawes owned a 12.5% working interest in the Baker-

Barnes No. 1 well and a 13.1146% interest in the Baker-Barnes No. 2 well.  At that time, MDR

owned a 0% interest in the Baker-Barnes No. 1 and 2 wells.  After February 13, 2002, Tawes owned a 40.901324% interest in the Baker-Barnes No. 1 well and a 41.023051% interest in the Baker-Barnes No. 2 well.  MDR then owned a 10.4511376% interest in the Baker-Barnes No. 1 well and a 10.258449% interest in the Baker-Barnes No. 2 well.

On June 2, 2003, the Bankruptcy Court authorized the operation of the Baker-Barnes No. 1 and 2 wells to resume under an approved operating agreement.  Riddle Engineering was designated as Operator for the Baker-Barnes No. 1 and 2 wells and was ordered to hold the proceeds from the production of the wells in two separate suspense accounts.  One account was to hold proceeds for working interest owners and the other account was to hold proceeds for royalty interest owners.

On September 9, 2003, the Bankruptcy Court granted Barnes partial summary judgment against Dominion for the unpaid amount of the undisputed 9.675% royalty in the Baker-Barnes No. 1 and No. 2 wells.  Litigation continued, however, over Barnes' entitlement to the 8.241% balance of the disputed 17.916% royalty.  Barnes has received the amount attributed to her undisputed 9.675% royalty in the David Baker No. 1 and the Baker-Barnes No. 3 wells that Dominion operates.

After entry of the September 9, 2003 Summary Judgment, various parties informed the Bankruptcy Court that a settlement had been reached between Barnes, Dominion and virtually all of the Moose Assignees, but not Tawes or MDR.  The Bankruptcy Court then issued a Final Case Management Order on July 26, 2004, directing all non-settling parties to file amended pleadings and a stipulation of facts and law.

Barnes filed her Fourth Amended Complaint on August 6, 2004.  Barnes alleged that Tawes and MDR were responsible for the royalties due from the Baker Barnes No. 1 and 2 wells that accrued prior to February, 2002 and that Tawes and MDR had "assumed the obligation" to pay

10

Barnes' royalty through the WIUA and the JOA.  Subsequently, Barnes filed a request for judgment against Tawes and MDR.  Because Tawes and MDR declined to participate in the settlement, Barnes decided to apply the payment associated with the settlement to her damages against Dominion.  Barnes then sought recovery for her unpaid royalties on the Baker-Barnes No. 1 and 2 wells from Tawes and MDR.  The proceeds attributable to Tawes and MDR's production after January, 2002 remained in suspense pending the Bankruptcy Court's adjudication of Barnes' claims.

On October 6, 2004, the Bankruptcy Court approved the above-mentioned settlement agreement.  Under the settlement, Dominion agreed to pay Barnes $200,000.00 directly and $156,124.96 from 90% of the suspended production proceeds attributable to the settling Moose Assignees working interest in the Baker-Barnes No. 1 and No. 2 wells.  In return for the settling Moose Assignees' agreement to allow Dominion to use the $153,124.96 as a portion of the settlement payment to Barnes, Dominion released its third party claims against the Moose Assignees.  In return for the Dominion settlement payment, Barnes waived any further claims against Dominion for damages attributable to non-payment of the undisputed or disputed royalty in the four wells as of July 31, 2004 and ratified her 9.675% royalty in the four wells effective August 1, 2004.

On August 22, 2006, the Bankruptcy Court ruled on Barnes' request for judgment against Tawes and MDR.  The Bankruptcy Court found that Tawes was liable to Barnes for all unpaid royalties that accrued prior to February, 2002, on the Baker-Barnes No. 1 and 2 wells under a third-party beneficiary theory.  Specifically, the Bankruptcy Court cited the following provision of the JOA:

> During the period of time Consenting Parties are entitled to receive Non-Consenting
> Party's share of production, or the proceeds therefrom, Consenting Parties shall be

11

> responsible for the payment of . . . all royalty . . . and other burdens applicable to Non-
> Consenting Party's share of production . . .

The court reasoned that under the above provision the Consenting Parties (including Tawes) agreed

to be obligated to pay royalties to Barnes.  The Bankruptcy Court also found that MDR was not

liable for any royalties prior to February, 2002.  Lastly, the Bankruptcy Court concluded that no

personal judgment against Tawes or MDR was required for royalties due after February, 2002,

because those royalties were suspended.

On November 9, 2006, the Bankruptcy Court entered a final judgment in the amount of

$291,846.00, which the Bankruptcy Court found was the amount of the unpaid and undisputed

royalty due Mrs. Barnes from the Baker-Barnes No. 1 and No. 2 wells as of February 2002.  The

Bankruptcy Court further found that Barnes was entitled to a royalty interest of 9.675% from

production subsequent to February, 2002, all of which had been paid.  The Bankruptcy Court

denied Barnes claims for attorneys' fees.

On December 22, 2006, Tawes appealed the judgment.  Barnes then cross-appealed.  On

the same date, the Bankruptcy Court ordered that the working interest funds held in suspense by

Riddle Engineering be distributed to Tawes and MDR.

## Standard of Review

This Court has jurisdiction to hear appeals from final judgments, orders and decrees of the

Bankruptcy Court.  28 U.S.C. § 158(a)(1).  When reviewing the Bankruptcy Court's decision, the

Court functions as an appellate court, and applies the standards of review generally applied by

federal appellate courts.  *In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992).  Findings of fact are

subject to the clearly erroneous standard of review.  FED. R. BANKR. P. 8013.  Questions of law,

however, are reviewed *de novo*.  *In re Oxford Mgmt.*, *Inc.*, 4 F.3d 1329, 1333 (5th Cir. 1993).

## Discussion

12

Tawes and MDR presently argue that: (1) longstanding Texas law preventing creditors from imposing liability on non-operators should preclude Barnes' recovery; (2) Barnes fails to meet the test for third-party beneficiary eligibility; (3) if Barnes is a third-party beneficiary, her rights are no greater than Dominion, which had no right to compel Tawes to pay Barnes' royalty; (4) the "law of the case" doctrine requires a finding that since Dominion could look only to Moose O&G for recovery, so must Barnes; (5) regardless of the theory of recovery, Tawes' liability cannot exceed his proportionate interest in the Baker Unit; and (6) Barnes' claims are barred by judicial estoppel.  Barnes argues that: (1) the Dominion-Moose agreements define Tawes and MDR's obligation to pay the royalty on production generated under the Barnes lease; (2) the Bankruptcy Court's ruling that Barnes is a third party beneficiary is consistent with applicable law; (3) Tawes and MDR are estopped by contract from denying liability for Barnes' royalty; (4) the Bankruptcy Court was wrong to decline considering Barnes' attorneys' fees claims; (5) the Bankruptcy Court was wrong to deny enforcement of Barnes' statutory royalty lien and not allow her to recover the judgment from the suspended production proceeds; (6) principles of judicial estoppel do not bar Barnes' claim; and (7) the law of the case doctrine is not applicable.  The Court will address these arguments in turn.

I.      **Effect of Texas Law Involving Partnership, Joint Venture and Agency on Operators'**
        **and Non-Operators' Royalty Obligations**

Operating agreements in the oil and gas industry typically include provisions obligating operators to pay certain costs and then to bill non-operators for these costs.  Such costs include expenses for development and operation.  For example, costs for development and operation may consist of expenses for drilling, labor and materials.  In this case, the operating agreement also contains provisions obligating the operator to pay certain royalties and then to bill the non-

operators for these royalties.

Tawes argues that the Bankruptcy Court erred when it held that Barnes was a third-party beneficiary of the WIUA and JOA because Texas courts have consistently rejected attempts of creditors to impose liability on non-operators.  Specifically, Tawes cites *Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 144 Tex. 475, 191 S.W.2d 716, 722 (1943)*, U.S. Truck Lines v. Texaco, Inc.*, 337 S.W.2d 497 (Tex. Civ. App.--Eastland 1960, writ ref'd), and *In re Mid-America Petroleum, Inc.*, 83 B.R. 937, 944 (Bankr. N. D. Tex. 1988) for the proposition that "[t]he only obligation of a non-operator is to pay its share of the costs of the well to the operator."  Tawes also cites *Johnson v. American Cometra, Inc.*, 837 S.W.2d 711, 715 (Tex. Civ. App.--Austin, 1992, writ denied), *Ayco Dev. Corp v. G.E.T. Serv. Co.*, 616 S.W.2d 184 (Tex. 1981), *Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 191 S.W.2d at 722, *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316 (Tex. Civ. App.--El Paso 1982, no writ), *Youngstown Sheet & Tube Co. v. Penn*, 355 S.W.2d 239, *aff'd as modified*, 363 S.W.2d 230 (Tex. 1962), and *Berchelmann v. Western Co.*, 363 S.W.2d 875 (Tex. Civ. App.--El Paso 1962, writ ref'd n.r.e.) for the proposition that "Texas courts have consistently rejected attempts by creditors to hold non-operators liable on partnership, agency, and joint venture theories."  From these cases, Tawes concludes that non-operators are entitled to proportionate, several liability and that the joint operating agreement creates no right of recovery in third parties against the parties to the joint operating agreement.

After examining the cases cited by Tawes, the Court finds that he is not entitled to relief for several reasons.  Each of the cited cases involve non-operators' liability for operators' costs associated with development and operation, but do not involve liability for royalties.  Indeed, Texas courts have held that non-operators are generally not liable under partnership, joint venture or agency theories for operators' development and operation costs.  Texas courts have justified this

approach by emphasizing that operators have significant discretion and autonomy for these costs under joint operating agreements. Texas courts have further emphasized that in regard to these types of costs operators are not permitted to extend non-operators' credit and may not legally bind non-operators. In turn, non-operators do not have control over operators' development and operations decisions and do not share their profits for these activities.

In this case, the relationship between non-operators and operators involving royalty payments is distinct from the relationship between non-operators and operators involving development and operation costs. First, each non-operator independently chooses whether or not he will be specifically responsible for royalty payments. As lessees, the non-operators choose to specifically obligate themselves to their lessors for royalties under their respective oil, gas and mineral leases. Therefore, the share of royalties due by each non-operator under the WIUA and JOA corresponds to his individual liability under his respective lease, except in the case of non-consent operations. In the case of non-consent operations, the parties independently choose whether or not they wish to participate, and therefore have control over whether or not to specifically incur additional royalty obligations. Second, the operators in this case have no discretion over royalty payments. Operators may not choose who to pay royalties to, what percentage royalty to pay, or when to pay royalties. Accordingly, the Court finds that payment of royalties by an operator in this case more closely resembles the action of an agent than the action of an independent contractor.

The cases cited by Tawes may also be distinguished on the ground that they involve theories of partnership, joint venture and agency while the case at bar involves third-party beneficiary theory. The control of one party over another is the touchstone of partnership, joint venture and agency. Third party beneficiary theory, however, requires an examination of whether

or not a direct benefit was conferred to a third-party and whether or not a benefit was intended to be conferred.  It is clear that these two classes of theories are distinct.

## II.      Barnes' Eligibility For Third-Party Beneficiary Status

Tawes argues that Barnes fails to qualify for third-party beneficiary status under the facts of this case.  Tawes cites *MCI Telecomm. Corp. v. Texas Utils. Elec. Co,* 995 S.W.2d 647, 651 (Tex. 1999), for the proposition that "[a] third party may recover on a contract made between other parties only if (1) the parties intended to secure a benefit to that third party, and (2) the contracting parties entered into the contract directly for the third party's benefit."  Tawes maintains that the WIUA and JOA clearly indicate that the parties contracted only for themselves because (1) Barnes is not specifically named in the agreements; (2) the payment of Dominion's share of royalties is one of several general classes of expenses that the Consenting Parties agree to pay in proportion to their interests; and (3) the JOA does not require a non-operator to pay anyone other than the operator.

The Supreme Court of Texas has summarized the basic precepts of third-party beneficiary law as follows:

> The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract.  A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit.
>
> To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefitted incidentally by the performance of, the contract.  One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation.  If, on the other hand, that performance will come to him in satisfaction of a legal duty owed to him by the promisee, he is a creditor beneficiary.  As the court of appeals noted, this duty may be an "indebtedness, contractual obligation or other legally enforceable commitment" owed to the third party.
>
> In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling.  A court will not create a third party beneficiary contract by implication.  The intention to contract or confer a direct benefit to a third

> party must be clearly and fully spelled out or enforcement by the third party must be
> denied.  Consequently, a presumption exists that parties contracted for themselves
> unless it "clearly appears" that they intended a third party to benefit from the contract.

*MCI Telecomm. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)(internal

citations omitted).  Furthermore, "[t]o determine the parties' intent, courts must examine the entire

agreement when interpreting a contract and give effect to all the contract's provisions so none are

rendered meaningless."  *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002)(citing *MCI Telecomm.

Corp.*, 995 S.W.2d at 652).  In construing an unambiguous contract, a court should give effect to

the intention of the parties as expressed or as is apparent in the writing.  *Exxon Corp. v. West Texas

Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993).

       The Court has examined the WIUA and JOA at length and disagrees with Tawes'

contentions.  The key provision in the WIUA and JOA provides as follows:

> During the period of time Consenting Parties are entitled to receive Non-
> Consenting Party's share of production, or the proceeds therefrom, Consenting Parties
> shall be responsible for the payment of all production, severance, excise, gathering and
> other taxes, and all royalty, overriding royalty and other burdens applicable to Non-
> Consenting Party's share of production not excepted by Article III.D.

According to the plain language of this provision, the consenting parties (including Tawes)

obligated themselves to be responsible for the payment of "all royalty" due on each non-consenting

party's share of production.  Tawes therefore obligated himself to perform a legal duty owed by

Dominion to a third party, namely, Barnes.  Accordingly, Barnes is properly considered a third-

party beneficiary under Texas law.

       This interpretation is consistent with the apparent intent of the parties.  In the absence of

non-consent operations, the royalties paid out of a party's share of production correspond to that

party's individual royalty liabilities under its respective leases.  However, in non-consent

operations, the non-consenting parties' royalties are paid out of production due to the consenting

17

parties.  Without additional protection, the non-consenting parties are at the mercy of the

consenting parties and the operator.  Therefore, it is entirely reasonable for the consenting parties

to obligate themselves to pay the non-consenting parties' royalties.

    The Court finds Tawes' specific arguments to be unavailing.  The Court has considered the

fact that Barnes is not specifically named in the WIUA and JOA, and although this is certainly a

factor to be considered, the Court does not find that it is dispositive.  The Court also disagrees with

Tawes contention that royalties can be generally equated with all other expenses.  The preceding

discussion in Section I, *supra*, highlights various distinctions between royalty obligations and other

costs for development and operations.  Lastly, the Court disagrees with Tawes' claim that the JOA

does not require Tawes to pay anyone other than the operator.  Although the JOA states that an

operator is obligated to pay certain royalties, it does not state that the operator is solely responsible

for the payment of royalties.  To the contrary, the JOA provides that in the case of non-consent

operations, the consenting parties are responsible for "all royalty."  The JOA does not limit the

consenting parties' responsibility to the operator.  This interpretation is consistent with the

language of Article III.B. of the JOA, which governs the interests of the parties in costs and

production, and appears to explicitly contemplate liability to third-party lessors.  After providing

for royalty liability, the provision provides, in part, as follows:

> No party shall ever be responsible, however, on a price basis higher than the price
> received by such party, to any other party's lessor or royalty owner, and if any such
> other party's lessor or royalty owner should demand and receive settlement on a higher
> price basis, the party contributing the affected lease shall bear the additional royalty
> burden attributable to the higher price.

## III.    Barnes' Right to Recover as a Third-Party Beneficiary

    Tawes maintains that if Barnes is a third-party beneficiary, her rights are no greater than the

rights accorded to Dominion under the WIUA and JOA.  Tawes directs the Court to two provisions

of the WIUA, which he claims preclude liability to Dominion.  The WIUA, in the pertinent part, provides as follows:

### LEASE BURDENS

Each party hereto shall bear and be responsible for their own lease burdens including, but not limited to their Lessor's royalty, overriding royalty along with any and all other royalty burdens which may have been created by the party contributing the lease or leases to this Working Interest Unit.

. . . .

### MOOSE INTEREST

Moose Oil & Gas Company shall be the liable party to the Operator for the entire Forty Six Percent (46%) working interest within the Working Interest Unit for the parties hereinabove referred to as Moose.  Moose Oil & Gas Company shall be the responsible party for each of said parties, to the Operator for obtaining and delivering any and all elections, notices, invoices, payments and billings.

It is undisputed that Tawes was included in the collective entity referred to as "Moose."

A third-party beneficiary has no greater rights than the original contracting party whose rights are being asserted.  *Alpine Ocean Seismic Survey, Inc. v. F.W. Myers & Company, Inc.*, 23 F.3d 946, 948 (5th Cir. 1994)(citing *Avatar Exploration, Inc. v. Chevron, U.S.A., Inc.*, 933 F.2d 314, 318 (5th Cir. 1991)); *Texas Farmers Ins. Co. v. Gerdes*, 880 S.W.2d 215, 218 (Tex. App.-- Forth Worth 1994, writ denied).  In construing an unambiguous contract, the court should give effect to the intention of the parties as expressed or as is apparent in the writing.  *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d at 302.  The language of a contract shall be given its plain grammatical meaning if possible, and the court should avoid any construction of a contract which is unreasonable, inequitable, and oppressive.  *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex. 1987).  When interpreting a contract, the court must seek the interpretation of the parties as such intention is expressed in the contract by considering all provisions of the contract and harmonizing, if possible, those provisions which appear to be in conflict. *Luckel v. White*, 819

19

S.W.2d 459, 462 (Tex. 1991).

After examining the WIUA and JOA, the Court believes that both provisions cited by Tawes do not prohibit Barnes' assertion of Dominion's rights. Tawes apparently claims that the provision titled "LEASE BURDENS" (hereinafter "lease burdens provision") conflicts with the following provision of the JOA:

> During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

(hereinafter "non-consent royalty provision"). These provisions, however, are not inconsistent and may be harmonized. The lease burdens provision does not explicitly provide that each party shall solely bear and be responsible for its lease burdens. Accordingly, the plain language of the lease burdens provision does not foreclose working interest owners from otherwise obligating themselves for royalty payments that do not correspond to their respective leases. Furthermore, the lease burdens provision indicates that each lessee will be responsible for the royalty due on the tracts governed by their respective leases. This arrangement is not possible in non-consent operations. As previously mentioned in Section II, *supra*, it is reasonable and expected for the parties to intend to hold consenting parties liable for the share of royalties attributed to a non-consenting party's interest in non-consent operations. Therefore, the non-consent royalty provision and the lease burdens provision may be harmonized by finding that the lease burdens provision governs royalty obligations generally, but in the case of non-consent operations, the non-consent royalty provision additionally obligates consenting parties.

The provision of the WIUA titled "MOOSE INTEREST" (hereinafter "moose interest provision") also does not preclude an assertion of Dominion's rights by Barnes. Under the moose

interest provision, Moose O&G is liable to "the Operator" for Tawes' interest and is responsible for delivering and obtaining Tawes' payments to "the Operator."  However, at the time that Barnes' royalties at issue accrued, Dominion was not "the Operator" of the the Baker-Barnes No. 1 and 2 wells.  Therefore, the moose interest provision does not prohibit Tawes' liability to Dominion.

**IV.     "Law of the Case" Doctrine**

Tawes asserts that under the "law of the case" doctrine, Barnes is precluded from asserting Dominion's rights.  Tawes claims that the Bankruptcy Court interpreted a provision analogous to the moose interest provision in favor of Tawes, thereby making it the law of the case.

On December 28, 2005, the Bankruptcy Court entered an order in a separate adversary proceeding involving the same parties to this case.  In the prior proceeding, Dominion, as operator, sought expenses related to the drilling of a well directly from Tawes, a non-operator.  The following provision was quoted and interpreted by the Bankruptcy Court:

> Moose Oil & Gas Company shall be the liable party to the Operator for the entire 27.5% working interest within the Working Interest Unit for the parties herein above referred to as Moose.  Moose Oil & Gas Company shall be the responsible party, for each of said parties, to the Operator for obtaining and delivering any and all elections, notices, invoices payments and billings.

As in this case, Tawes was included in the collective term "Moose."  The Bankruptcy Court held that the above provision precluded Dominion from recovering the drilling expenses from Tawes.  This decision was later affirmed by this Court on March 30, 2007.

The "law of the case" doctrine provides that when a court of competent jurisdiction decides upon a rule of law, that decision governs the same issues in subsequent stages of the same case.  *U.S. v. O'Keefe*, 169 F.3d 281, 283 (5th Cir. 1999)(citing *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)).  However, the law of the case doctrine is a discretionary rule of practice which does not limit the power of a court to revisit a

legal issue.  *Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1424 (5th Cir. 1995)(citing *Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983)).

The Court finds that the law of the case doctrine does not preclude Tawes' liability to Barnes.  Although the Bankruptcy Court and this Court interpreted a provision that mirrors the moose interest provision at issue, these prior decisions were made in a different factual context.  In the prior decisions, Dominion was "the Operator" at issue and in this case it is not.  Because Dominion is not "the Operator", the law of the case does not presently constrain this Court.  Furthermore, although the provision at issue may prevent liability to "the Operator," it does not prevent liability to third parties.

## V.     Extent of Barnes' Liability

Tawes maintains that his liability for Barnes' royalty cannot exceed his proportionate share of Dominion's non-consent interest.  Tawes directs the Court to the JOA, which defines the term "Consenting Party" as "a party who agrees to join in and pay its share of the cost of any operations."

Tawes contentions are not supported by the plain language of the JOA.  In addition to the provision cited by Tawes, the portion of the JOA governing non-consent operations provides, in part, as follows:

> If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party, at its

22

election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting parties shall keep the leasehold estates and the oil and gas interests involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. . . .

. . . .

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

While the second paragraph cited above provides that non-consenting parties are proportionately liable for costs, the third paragraph (the non-consent royalty provision) provides that the consenting parties are responsible for the payment of "all royalty."  This non-consent royalty provision would be wholly unnecessary if the second paragraph was intended to govern royalty liabilities.  Instead, the JOA appears to draw a distinction between non-royalty costs and royalties.  Indeed, Article III.B. also distinguishes between non-royalty costs and royalties.  This distinction helps to explain the meaning behind the definition of "Consenting Parties" cited by Tawes.  Furthermore, it is not unreasonable to hold each consenting party fully liable for all royalties due by a non-consenting party.  Only under non-consent operations are parties wholly reliant on others for their individual royalty obligations.  Therefore, it is not surprising that these non-consenting parties bargained for maximum protection.  Lastly, other provisions in the JOA specifically indicate the scope of intended liability.  For example, Article III.B. provides that in operations where all parties consent, the parties are liable for royalties "to the extent of [their] interest in such production."  The non-consent royalty provision, however, conspicuously uses the terminology "all

23

royalty."

## VI.     Judicial Estoppel

Tawes maintains that the doctrine of judicial estoppel prevents Barnes from making the claim that Tawes is liable to her for royalties.  Tawes points out that Barnes has previously argued that "Provision III of the Working Interest Unit Agreement denies transfer [by Dominion] of liability for royalty interests."  Tawes further argues that Barnes had previously maintained that Tawes did not have privity of contract or privity of estate with Barnes.

The Fifth Circuit has recognized three requirements for judicial estoppel: (1) the party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent.  *In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004)(citations omitted). "The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest."  *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999)(quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)).

The Court has examined the Barnes' previous litigation positions referenced by Tawes and finds that they are not clearly inconsistent with Tawes liability as a third-party beneficiary.  The first argument referenced by Tawes, that Provision V of the WIUA denies transfer of liability, is not inconsistent with Tawes third-party beneficiary liability because two parties may be liable for the same debt on different theories.  Similarly, the second argument referenced by Tawes is also not inconsistent with Tawes third-party beneficiary liability, because it merely involves privity of contract and privity of estate.  Under third-party beneficiary theory, Barnes does not need to be in privity of contract or privity of estate to recover from Tawes.

24

## VII.   Barnes' Attorneys' Fees

Cross-appellant Barnes maintains that the Bankruptcy Court was wrong in declining to hear Barnes' claims for attorneys' fees.  Barnes argues that the Bankruptcy Court incorrectly concluded that a third-party beneficiary could not collect attorneys' fees based upon a breach of contract.

Under Texas law, third party beneficiaries are entitled to recover attorneys' fees under section 38.001 of the Civil Practice and Remedies Code.  *Ischy v. Twin City Fire Ins. Co.*, 718 S.W.2d 885, 888 (Tex. App.--Austin 1986, writ ref'd n.r.e.); *See Dairyland County Mutual Ins. Co. of Texas v. Childress*, 650 S.W.2d 770 (Tex. 1983).  Accordingly, the Bankruptcy Court must hear and consider Barnes' attorneys' fees based claims.[2]

## VIII.   Section 9.343 of the Texas Business & Commerce Code

Barnes maintains that the Bankruptcy Court erred in denying enforcement of Barnes' statutory royalty lien and by not allowing Barnes to recover her judgment from the suspended production proceeds.  Barnes asserts that under Section 9.343(r)(3) of the Texas Business and Commerce Code, "Moose – on its behalf and on behalf of the Baker Lease Investors – was an 'operator that receives production proceeds from a third party purchaser' pursuant to an agreement under which 'the operator collects proceeds of production on behalf of other interests owners.'"  Barnes therefore claims that under Section 9.343 of the Texas Business and Commerce Code ("Section 9.343") she holds a lien on the production royalty proceeds that Moose O&G collected while it operated the Baker-Barnes No. 1 and 2 wells.  Barnes asserts that she should be permitted to collect this money from Tawes and MDR because they purchased Moose O&G's interest in the wells at issue.

---

[2] Both parties raise issues related to presentment and the value of attorneys' fees.  It would be premature for the Court to rule on these issues because the record is not adequately developed.

Section 9.343 of the Texas Business and Commerce Code ("Section 9.343") provides, in part, as follows:

> (a) This section provides a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price.  An authenticated record giving the interest owner a right under real property law operates as a security agreement created under this chapter.  The act of the first purchaser in signing an agreement to purchase oil or gas production, in issuing a division order, or in making any other voluntary communication to the interest owner or any governmental agency recognizing the interest owner's right operates as an authentication of a security agreement in accordance with Section 9.203(b) for purposes of this chapter.
>
> (b) The security interest provided by this section is perfected automatically without the filing of a financing statement. . . .
>
> (c) The security interest exists in oil and gas production, and also in the identifiable proceeds of that production owned by, received by, or due to the first purchaser:
>
>> . . . .
>>
>> (1) for an unlimited time if:
>>
>> . . . .
>>
>>> (C) the proceeds are cash proceeds, as defined in Section 9.102; and
>>
>> (2) for the length of time provided in Section 9.315 for all other proceeds.
>>
>> . . . .
>
> (j) A security interest or statutory lien created by this section remains effective against the debtor and perfected against the debtor's creditors even if assigned, regardless of whether the assignment is perfected against the assignor's creditors. . . .
>
>> . . . .
>
> (r) In this section:
>
>> . . . .
>>
>> (2) "Interest owner" means a person owning an entire or fractional

interest of any kind or nature in oil or gas production at the time of severance, or a person who has an express, implied, or constructive right to receive a monetary payment determined by the value of oil or gas production or by the amount of production.

(3) "First purchaser" means the first person that purchases oil or gas production from an operator or interest owner after production is severed, or an operator that receives production proceeds from a third-party purchaser who acts in good faith under a division order or other agreement authenticated by the operator under which the operator collects proceeds of production on behalf of other interest owners. To the extent the operator receives proceeds attributable to the interest of other interest owners from a third-party purchaser who acts in good faith under a division order or other agreement authenticated by such operator, the operator is considered to be the first purchaser of the production for all purposes under this section, notwithstanding the characterization of other persons as first purchasers under other laws or regulations. To the extent the operator has not received from the third-party purchaser proceeds attributable to the operator's interest and the interest of other interest owners, the operator is not considered the first purchaser for the purposes of this section and is entitled to all rights and benefits under this section. Nothing in this section impairs or affects any rights otherwise held by a royalty owner to take its share of oil in kind or receive payment directly from a third-party purchaser for the royalty owner's share of oil production with or without a previously made agreement.

(4) "Operator" means a person engaged in the business of severing oil or gas production from the ground, whether for the person alone, only for other persons, or for the person and others.

After examining Section 9.343, the Court finds that the Bankruptcy Court did not err. If Moose O&G was a "first purchaser", any statutory lien held by Barnes would not give Barnes any specific rights to the suspended proceeds at issue. As explained in *Anadarko E. & P. Company, L.P. v. Clear Lake Pines, Inc.*, 2005 WL 1583506 (Tex. App.--Austin July 7, 2005), accrued royalties are interests in personal property. 2005 WL 1583506 at *3 (citing *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 371 (Tex. 2001); *Texas Oil & Gas Corp. v. Moore*, 630 S.W.2d 450, 452-53 (Tex. App.--Corpus Christi 1982, writ dism'd w.o.j.)). Because Barnes' lien would only involve Moose O&G's personalty, it would not pass with Moose O&G's conveyance of its working interest

27

to Tawes and MDR.  *See id.*  Furthermore, the record does not support a finding (1) that Tawes or MDR were "first purchasers" at any relevant time; (2) that Tawes or MDR otherwise assumed Moose O&G's lien obligations; or (3) that Tawes or MDR acquired any funds held by Moose O&G, let alone the specific prior production proceeds attributable to royalties that Moose O&G failed to pay.

### Conclusion

The decision of the Bankruptcy Court is hereby AFFIRMED in part and REVERSED in part.

Signed this 31st day of March, 2008.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

28